F. W. HEMAN, RECEIVER, Appellant, *v.* JAMES H. BRITTON
ET AL., Respondents.

### May 12, 1883.

1. EQUITY PRACTICE — REFEREES. — A referee's findings of fact in an equity proceeding is not conclusive upon the trial, or the appellate, court.

2. CORPORATIONS — DISTRIBUTION OF ASSETS. — After providing for the payment of its debts a corporation may distribute its assets among its shareholders.

3. —— RECEIVERS — EQUITY. — Assets distributed to shareholders, subject to a pledge to secure creditors, belong, in equity, after the debts for which the pledge is made are paid, not to the receiver of the corporation, but to the shareholders.

4. —— The debts of the corporation being paid, assets distributed among the shareholders subject to a pledge for the payment of the debts, can not be subjected to the payment of the costs of the receiver's administration.

APPEAL from the St. Louis Circuit Court, HORNER, J.
*Affirmed.*

B. H. DYE and DRYDEN & DRYDEN, for the appellant : The assets of a corporation are a trust fund for creditors, and can not be distributed until after all debts are paid.— *Wood* v. *Drummer*, 3 Mason, 308; Thompson on Stock., sect. 10; *Gill* v. *Balis*, 72 Mo. 424; *Sawyer* v. *Hoag*, 17 Wall. 610; *Upton* v. *Trebilcock*, 1 Otto, 45. The findings of a referee in an equity proceeding are not binding upon the courts. — *O'Neill* v. *Capelle*, 62 Mo. 208; *Moniteau Nat. Bank* v. *Miller*, 73 Mo. 192.

OVERALL & JUDSON, for the respondents : A corporation may distribute its assets among its stockholders after providing for the payment of its debts. — Morawitz on Priv. Corp., sect. 573.

BAKEWELL, J., delivered the opinion of the court.

The petition alleges that defendants, by a vote of the directors of the De Soto Insurance Company, of which plaintiff

is receiver, received eleven Missouri state bonds of $1,000 each, assets of the company, which they received and hold in trust for and to the use of the company ; that the company is insolvent ; that the bonds are needed to satisfy its liabilities ; that the defendants knew all this when they received the bonds.   The prayer is for an account and a return of the bonds to plaintiff as receiver.   The answer was a general denial.   The cause was referred by consent.

The referee made a special finding of facts, and reported that plaintiff ought to recover ten bonds and $1,411.05 and interest ; and in case defendants do not deliver up the bonds, then the judgment should be $10,000.   The trial court sustained exceptions to the report, and, taking the report as a special verdict, found for defendants.

As the proceeding is in equity, and all the testimony is brought up, the question for our consideration is not whether, upon the facts as found by the referee, the court erred in finding for the defendants.   The findings of fact by the referee are not conclusive upon the trial court, or upon this court, in a proceeding in equity, though they may have weight.   If upon the facts in evidence the plaintiff was not entitled to a decree, we have nothing to do but to affirm the judgment.

There can be no controversy, however, about the material facts, which are as follows : The De Soto was a mutual life insurance company, organized in 1869 by a small body of well known business men in St. Louis.   At the time of the occurrences hereafter detailed, the shares of stock were twelve hundred and ninety in number, divided in the following proportions among the following shareholders :   William Ballentine, 378 ; John Jackson, 120 ; Wm. E. Burr, 75 ; A. Johnson, 50 ; Thomas E. Tutt, 50 ; John R. Lionberger, 196 ; James H. Britton, 196 ; James H. Lucas, 100 ; H. S. Turner, 50 ; Wm. J. Lewis, 50 ; H. Christopher, 25 shares. In 1871, the company was found not to prosper, and it ceased to do business, and reinsured its risks in a Chicago

company. The Chicago company failed in 1874, and the De Soto reinsured its risks in the Mound City, afterwards known as the St. Louis Life, and still later as the Columbia Life Insurance Company of St. Louis. At the time of this contract with the Mound City, the De Soto liabilities were small, consisting mainly of fifty-four policies valued at $20,019.50, which the Chicago company had not been able to get in for cancellation. Its assets consisted mainly of the securities valued at $100,000.00, which by law the De Soto had on deposit with the superintendent of insurance, of which the bonds received by defendants were a part.

The contract of the De Soto with the Mound City was duly executed by both companies, on the 12th of February, 1874. By its terms the Mound City agreed to assume and pay, and hold the De Soto harmless from the fifty-four policies spoken of above, and all other debts and liabilities, and, by the substitution of other securities, to cause to be released the $100,000 of securities of the De Soto on deposit with the insurance department; and, immediately after the execution of the agreement, to assign and deliver these securities, when released, to Lionberger, Ballentine, and Britton (defendants herein), in trust for the then individual stockholders of the De Soto; also to assign and deliver to the same trustees, upon the same trust, all other effects of the De Soto thereinafter assigned to the Mound City. The De Soto, on its part, agreed to pay to the Mound City, upon the delivery of the assets and securities to the three trustees above named, $20,019.55. It assigned and transferred to the Mound City all its assets, except the $100,000 of securities in the insurance department. It agreed to give the Mound City a bond for $10,000, executed by Ballentine, Lionberger, Jackson, Tutt, Burr, and Britton (the six defendants herein), conditioned to indemnify the Mound City from all demands against the De Soto presented within five years, except upon the fifty-four poli-

cies.   It agreed, that after the delivery of assets and securities, the De Soto would secure a transfer of its capital stock to such persons as the Mound City should name, on the understanding that such transferees were not to participate as beneficiaries in the division of the securities and assets to be delivered to the three trustees, which was to be for the benefit only of those who owned the De Soto stock at the time of its transfer to the Mound City.

On February 12, 1874, the date of this contract, at the same board meeting at which it was authorized, before any thing had been done under it, eight of the eleven stockholders, representing together one thousand and ninety shares of stock, being present at the time, the board of directors of the De Soto passed the following resolutions : —

" On motion of Mr. Lionberger, duly seconded and carried, John R. Lionberger, James H. Britton, and William Ballentine were appointed trustees to carry out the provisions of the contract executed with the Mound City Life Insurance Company, and were authorized to receive and distribute the securities and assets of this company, and to distribute the same among the present individual stockholders of the company as their interests therein may be shown by certificates of stock."

" *Resolved*, That, whereas James H. Britton, William Ballentine, John R. Lionberger, John Jackson, Thomas E. Tutt, and William E. Burr, have executed a bond for $10,000, as is provided for in the agreement this day entered into between this company and the Mound City Mutual Life Insurance Company, of this city, now, then, to secure the said signers of said bond, and to save them from loss and damage, it is hereby ordered that eleven bonds of $1,000 each, now the assets of the company, issued by the state of Missouri, be deposited with the Safe Deposit Company, of this city, subject to their order, or order of their legal representatives, and full power is hereby given them to sell any or all of said bonds at any time, and with the proceeds

thereof pay any lawful demands that may be made upon them under said bond."

All the defendants were directors of the De Soto, and took part in this directors' meeting of February 12, 1874. Two days after this meeting the president and secretary of the De Soto withdrew the $100,000 of securities from the custody of the insurance department, and the Mound City substituted other securities, as agreed. This was the last meeting of the De Soto directory. Nothing took place at it which has any bearing upon the issues in this case. The eleven bonds were then received by respondents; and, on the 28th, they executed the bond of indemnity, according to the agreement with the Mound City. Meanwhile the $100,000 of securities had been distributed ratably among the stockholders. These eleven bonds must, of course, be excepted from the last statement. They were incapable of distribution, from their amounts. But, as to them, the six trustees, defendants here, executed certificates of which one was delivered to each stockholder. These certificates were in the following form, *mutatis mutandis*, as to names and amounts : —

" WHEREAS, we, the trustees appointed by the board of directors of the De Soto Mutual Life Insurance Company, at a meeting held February 12, 1874, hold eleven bonds of the state of Missouri of $1,000 each, bearing interest at six per cent per annum ; and whereas, said bonds are held by us to indemnify Wm. Ballentine, James H. Britton, John R. Lionberger, John Jackson, Wm. E. Burr, and Thomas E. Tutt against any loss by claims or otherwise that may accrue against them by reason of a certain bond of indemnity executed by them to the Mound City Life Insurance Company, dated February 28, 1874 ; and whereas, it is understood that all claims accruing under said bonds of indemnity shall first be paid out of said bonds, also such expenses as may accrue for safe keeping of the same ; then the remainder, when released by expiration of said bond of indemnity, five years from February 12, 1874, shall be divided among the fol-

lowing named persons in the proportion indicated by the fractions set opposite their names: " (Then follow the names of the eleven stockholders and their interests in the stock, beginning "Wm. Ballentine, $\frac{378}{1290}$,") etc. "Now this certifies that John R. Lionberger is entitled to receive upon the return of this certificate, properly indorsed $\frac{196}{1290}$ of the proceeds of said bonds, when divided as above."

Defendants collected the interest; and, out of that and the sale of one bond, paid some claims against the De Soto. When the original bonds matured, they invested the proceeds in ten similar bonds; and at the expiration of their liability under the terms of the bond, they had on hand ten bonds and $1,411 cash proceeds. The five years' limit of liability under the bond expired on the 28th of February, 1879. This suit was begun in November, 1879. All claims presented against the Mound City, *alias* Columbia, in the five years, had been paid, and there were none outstanding. The referee found that the liabilities of the De Soto were fully secured from the assets pledged to the Mound City. Of that there can be no doubt. The Mound City failed; and in the course of the proceedings to wind her up, the superintendent of insurance delivered to plaintiff ten part due notes of $10,000 each, secured by mortgage. Plaintiff's share of the proceeds of the mortgaged property will be something like $70,000. When the De Soto was proceeded against by the insurance department, its insurance reserve was less than $4,000. This was afterwards increased to $5,569. There is no other liability of the De Soto except the expenses of administration, say $6,000. It is within bounds to say that the assets of the estate of the De Soto are more than four times her present and prospective liabilities.

Some of the certificates set out above have been negotiated. They are all outstanding.

Pending his intervening petition against the receiver of the Columbia to recover his share of the insurance deposit

and pending this suit, plaintiff, by leave of court, borrowed of James Baker $5,000, for expenses of administration; of this sum $2,666 and interest remains unpaid.

There can be no doubt that a corporation, after making provision to pay its debts, may distribute its assets among its stockholders. This corporation made ample provision for the payment of its debts. The question is, were these bonds distributed to the stockholders by the corporation, or were they, in the general distribution of the other assets, retained by the corporation, when pledged to the six directors who gave the indemnifying bond?

As to this, the referee found that, " notwithstanding the provision for the distribution of assets, and notwithstanding also that the contract with the Mound City appointed the same three to take the whole deposit when released, and hold the same for the then stockholders of the De Soto, the board of directors subsequently, at the same meeting, on February 12, 1874, withdrew from the assets of the company the eleven bonds in question, and pledged them to secure the signers of the indemnity bond, which act was an appropriation of the bonds inconsistent with the distribution of them by those three trustees, and which, in my opinion, left the bonds vested in the company subject to the trust, or pledge, to the bondsmen."

In effect, the stockholders as individuals could not distribute the assets of the company. These belonged to the corporation, and could only be distributed amongst the stockholders according to their interests, by the corporation, acting in its corporate capacity through its proper officers. Nor does it appear how the corporation could pledge what it had already distributed. There seems to have been an intention of distributing the whole $100,000 of assets. But, in the very act of making this distribution, a definite portion of these assets, to wit, these bonds, were withheld from distribution; and, whilst three trustees were named to receive and distribute the assets in accordance with the

terms of the contract with the Mound City, it was ordered that, of these assets, the eleven bonds spoken of in the resolutions as being yet assets of the corporation, should not be distributed, but deposited to the order of the six persons who had become liable for the corporation, and in trust, to sell them, if necessary, and pay demands against the company with the proceeds.

The subsequent act of issuing a certificate to each stockholder, setting forth his interest in these bonds, was the act of the stockholders to whom the bonds had been delivered as security for any risks they took by becoming bound for the company ; and neither that, nor anything subsequent to that, can change the nature of the act done by the corporation on the 12th of February.

But the nature of that act is plain enough, if we are to have any regard to the intention of the corporation, as manifested by its contract with the Mound City and the resolutions of the board of directors, and the whole transaction viewed together.   It was simply to distribute amongst the stockholders the assets received from the Mound City. In order to effect this without injustice, a provision was made to meet any small outstanding claims.   As six stockholders had become bound to indemnify the Mound City against such claims, they were in turn to be indemnified ; and, for this purpose, these eleven bonds were subjected to their contract, but undoubtedly with the intention, that when such claims had been discharged, the remaining proceeds of the bonds should belong to the stockholders.   These bonds, under the resolution of the board, belonged to the stockholders from its date, according to their respective interests in the stock of the company, and were pledged by the corporation, with the assent of the stockholders, as property in the hands of the corporation, in which each stockholder had the interest represented by his stock, the proceeds, after satisfying the claims for which they were pledged, to be delivered by the trustees to the stockholders

*pro rata.* There can be no doubt as to the intention of the parties interested ; and it does not appear how the matter can concern the creditors of the corporation represented by the receiver. We do not see that this pledge of these bonds was an act necessarily inconsistent with the distribution by the trustees, or that it left these bonds vested in the corporation contrary to the clear intention of the stockholders, the board of directors, and everybody concerned. That they are spoken of in the resolution as " assets of the corporation," is immaterial. The expression is not inapt under the circumstances. They were assets of the corporation at the inception of the act, in the carrying out of which they ceased to be so. The corporation rid itself of all its assets, having first secured its creditors.

There seems to be no reason why the stockholders of the De Soto should be interfered with, since the corporation was abundantly solvent, in an attempt quietly and honestly to wind up what was really their own affair, without the accruing of large costs for no purpose beneficial to the stockholders, the creditors of the corporation, or the general public.

That there was no actual distribution of these eleven bonds when the other assets were distributed, and that this pledge of the bonds was inconsistent with such a distribution, does not seem to us to be decisive of the question. Equity looks through forms to substance. It is manifest that the substance of this transaction was, that the corporation divested itself of its assets for the purpose of distributing them amongst the individual stockholders composing the corporation so fully as this could be done consistently with pledging these eleven bonds to secure certain stockholders who had become bound for the corporation to enable it to carry out its desire of completely divesting itself of all its assets and vesting them in the stockholders, according to their respective proportions of stock. These pledgees then held the stock in trust for certain purposes named, and

when those purposes were fulfilled, and the liability for which the bonds were pledged was at an end, then, in trust for whom? For the corporation that pledged the bonds? Clearly not, since the pledge was made to facilitate a complete distribution amongst the stockholders of all the assets of which these bonds were a part. The bonds were distributed, so far as this was consistent with their being pledged. When the liability of the pledgees for the debts of the corporation was at end, then the bonds, or whatever might replace them, or their proceeds, were to be actually distributed, the corporation having clearly manifested its intention whilst delivering these bonds to the pledgees, that, subject to the pledge, the bonds should belong to the stockholders.

We think that the judgment of the circuit court should be affirmed. It is so ordered. All the judges concur.